UNITED STATES DISTRICT COURT                    c
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

KELLY R. BROWN                    CIVIL ACTION NO. 1:15-CV-02275

VERSUS                            JUDGE TRIMBLE

U.S. COMMISSIONER OF              MAGISTRATE JUDGE PEREZ-MONTES
SOCIAL SECURITY

---

## REPORT AND RECOMMENDATION

Kelly R. Brown ("Brown") filed an application for Social Security Disability Insurance Benefits ("DIB") on November 8, 2012. (Doc. 10, p. 124/339). Brown alleged a disability onset date of February 1, 2012. (Doc. 10, p. 124/339). Brown's DIB claim was denied by the Social Security Administration on May 7, 2013. (Doc. 10, p. 70/339).

A *de novo* hearing was held on January 27, 2014, before an administrative law judge ("ALJ"), at which Kelly appeared with Cheri Burns, representative for claimant, and Thomas Lafosse, a vocational expert ("VE"). (Doc. 10, p. 31/339). The ALJ denied Brown's claim on April 17, 2014. (Doc. 10, p. 13/339). The ALJ found that Brown's affective disorder and cognitive disorder were "severe impairments" at step 2. (Doc. 10, p. 25/339). The ALJ further found that these impairments did not meet the requirements of a listed impairment. (Id.). The ALJ also determined Kelly's residual functional capacity ("RFC") and concluded that he was able to perform work at all exertional levels but was limited to simple routine repetitive work with only occasional work decisions. (Id.). The ALJ found that Kelly was able to perform his

past relevant work of line supply (alternate name: material handler). (Doc. 10, p. 26/339).

The Appeals Council denied Brown's request for review and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner"). (Doc. 10, p. 6/339).

Brown next filed this appeal for judicial review of the Commissioner's decision. Brown contests the ALJ's finding that Brown's physical impairments are not severe, arguing it is contrary to the assessment of Brown's treating source, which the ALJ improperly rejected. (Doc. 11).

The Commissioner filed a brief in response to Brown's appeal (Doc. 12), to which Brown replied (Doc. 13). Brown's appeal is now before the Court for disposition.

Eligibility for DIB

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be disabled as defined by the Social Security Act.  See 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings.  First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than 12 months.  See 42 U.S.C. § 423(d)(1)(A).  Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  See 42 U.S.C. 423(d)(2).

Scope of Review

In considering Social Security appeals, the Court is limited by 42 U.S.C. § 405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. See McQueen v. Apfel, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. See Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision, but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. See Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. See Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. See Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981); see also Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings that are not supported by substantial evidence and to correct errors of law. See Dellolio, 705 F.2d at 125. But to make a finding that substantial evidence does not exist, a

3

court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  See Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

## I.  Summary of Pertinent Facts

### A.  Medical Records

Brown was 56 years old when he applied for disability benefits in November 2012. (Doc. 10, p. 124/339). Brown worked as a lineman from 2001-2012 and in various jobs involving construction and labor from 1998-2000. (Doc. 10, pp. 140, 174/339).

On June 8, 2010, Brown had an examination with Dr. Eric Dupree ("Dr. Dupree") at Winn Family Medicine. Brown presented with complaints of abdominal bloating that nauseated him and made him "feel like he is going to pass out" for at least the prior six months. He was treated for gastritis with Pepcid and Zegerid and referred to a gastroenterologist. (Doc. 10, p. 290/339).

On August 31, 2010, Brown had another appointment with Dr. Dupree for a complaint of numbness in his feet and follow-up for his hypertension. He was treated for myalgia and hypertension and was scheduled for an esophagogastroduodenoscopy and colonoscopy evaluation to assess his gastritis. (Doc. 10, pp. 288-89/339).

On March 15, 2011, Brown had a checkup with Dr. Dupree. Brown complained of ankle swelling, lightheadedness, "feeling crazy in the head in AM's," and trouble breathing at night due to sinus congestion. Dr. Dupree indicated that Brown's

hypertension was at goal compared to his prior visit. (Doc. 10, p. 285/339). Brown was treated for edema and hypertension. (Doc. 10, p. 286/339).

On March 29, 2011, Brown presented for follow-up with complaints of his feet and ankles being swollen. Although the swelling was slightly better from the previous visit, his hypertension was worse. He was treated for edema and hypertension. (Doc. 10, p. 283/339).

On April 12, 2011, Brown presented for follow-up for the swelling in his feet. Brown continued treatment for edema and hypertension. Brown also complained of "bloating without food, worse at rest after work, (and beer resolves it)." (Doc. 10, p. 281/339).

On June 21, 2011, Brown was examined by Dr. Dupree due to his blood pressure being high the previous three weeks. He additionally complained of dizziness, headache, and mild blurry vision. Treatment notes indicated that the hypertension was worse compared to the prior visit. Brown was treated for hypertension. (Doc. 10, p. 279/339).

On June 29, 2011, Brown was examined by Dr. Dupree for continued complaints of dizziness "off and on" for the past three years. Brown indicated that he did not eat or drink much due to a lack of appetite and noted that he had used Reglan[1]

---

[1] Reglan is a brand name of metoclopramide. "Metoclopramide is used to relieve heartburn and speed the healing of ulcers and sores in the esophagus (tube that connects the mouth to the stomach) in people who have gastroesophageal reflux disease (GERD; condition in which backward flow of acid from the stomach causes heartburn and injury of the esophagus) that did not get better with other treatments. Metoclopramide is also used to relieve symptoms caused by slow stomach emptying in people who have diabetes. These symptoms include nausea, vomiting, heartburn, loss of appetite, and feeling of fullness that lasts long after meals. Metoclopramide is in a class of medications called prokinetic agents. It works by speeding the movement of food through the stomach and intestines." https://medlineplus.gov/druginfo/meds/a684035.html

a few months prior, but had not taken it again. Brown expressed concern that he was not able to work due to dizziness and weakness. The physician concluded that the dizziness and weakness mostly stemmed from patient's nutritional habits and prescribed Brown metoclopramide. (Doc. 10, p. 277/339).

On February 9, 2012, Brown was examined by Dr. Dupree for a complaint of weight loss. The physician recommended a CT of the abdomen and pelvis and a chest x-ray, as well as screenings for malignant neoplasm of the prostate and rectum. (Doc. 10, p. 274/339).

On February 21, 2012, Brown received a CT of his abdomen and pelvis. (Doc. 10, p. 265/339). Degenerative changes of the lower lumbar spine were noted. Otherwise, findings were normal. (Id.). An x-ray of the chest found degenerative change at the thoracic spine and a 6.5 mm nodule at the left lung base. (Doc. 10, p. 266/339). A CT performed on March 1, 2012 found evidence of prior granulomatous disease. (Doc. 10, 267/339).

On March 1, 2012, Brown received an examination from Dr. Dupree. (Doc. 10, p. 272/339). He presented with complaints of anorexia and associated weight loss, early satiety, and poor appetite. Brown lost 18 pounds since June 2011, but showed no weight loss since February 2012. Brown additionally had been having swelling and drainage from his keloid. (Id.). The chest CT had been reviewed, and since the nodule was only granulomatous disease, he was referred for further study. (Doc. 10, p. 273/339).

On July 2, 2012, Brown was admitted to the Central Louisiana Emergency Department. He presented with headache, dizziness, and "shaking all over." Slight tremors were noted. He was discharged July 3. (Doc. 10, p. 304/339).

On July 19, 2012, Brown received an examination from Dr. Dupree. (Doc. 10, p. 270/339). He presented with complaints of tremors in both hands and legs, which were made worse by standing. Brown also had a large fungating keloid on the neck which led to dysphagia and fatigue as it had been chronically infected. (Id.). According to physician notes, an ENT had recommended that the keloid be surgically excised, but no plans had been set. (Id.). Brown was assessed with essential and other specified forms of tremor and the keloid scar. He was referred to neurology for further evaluation and to follow-up with the ENT for further care of the keloid scar. (Doc. 10, pp. 270-71/339).

On July 29, 2012, Brown presented to Dr. Dupree with a request to talk to the doctor about his tremors and keloid scar. (Doc. 10, p. 311/339). He was referred to neurology for further evaluation. (Id.). He was advised to keep his follow-up with the ENT for further care and possible removal of his keloid scar due to symptoms persisting with dysphagia and infective symptoms. (Doc. 10, p. 312/339).

On August 6, 2012, an electroencephalogram was performed. Notes indicated that it was a normal electroencephalogram recorded during the awake and drowsy states. (Doc. 10, p. 297/339).

On August 8, 2012, Brown presented to CENLA Neurology for a consultation regarding his tremors following a referral from Dr. Dupree. (Doc. 10, p. 292/339).

Brown stated that he has had some tremors since he was about 20-years old, mainly involving his hand and feet, but that they had progressively worsened. Brown noted that the tremors are associated with difficulty walking. (Id.). He additionally complained that he had difficulty holding on to things and falls a lot, and that those symptoms are worsened by maintaining a posture and standing. He further complains that he has difficulty eating and resting, loss of appetite, and an on and off headaches. He stated that he had numbness and tingling in his hands and loss of hand grip, and some memory loss associated with forgetfulness and passing out for "split seconds." He noted he had passed out on three occasions. (Id.). It was also noted that he drank beer daily. (Doc. 10, p. 293/339).

The physician stated that Brown's recent memory was impaired but remote memory was intact. (Doc. 10, p. 294/339). The physician performed testing to determine strength and reflex. (Doc. 10, p. 294-95/339). Normal finger-to-nose, heel-to-shin, and rapid alternating movements were present, and there was no truncal instability. (Doc. 10, p. 296/339). Tremors were present in left and right arm and leg. Additionally, there was normal toe-and-heel walk, but tandem gait was unsteady. (Id.).

Brown received an MRI on his head in September 2012. Minor white matter hyperintensity consistent with age related small vessel ischemic degeneration was noted and probable frontoethmoidal sinusitis. (Doc. 10, p. 268/339).

On December 14, 2012, Brown completed a form from the Louisiana Department of Children and Family Services Disability Determination Services. The

8

Department had sent Brown a letter requesting additional information concerning his seizures, to be completed by someone who has witnessed the seizures. (Doc. 10, p. 169/339). His sister stated that when Brown has a seizure, he is weakened, has trouble standing, shakes, becomes incoherent, and falls. She stated "NA" to the last time she witnessed his seizures and how often they occurred. She additionally stated that the seizures are sporadic and she did not know if he was on medication for seizures. (Doc. 10, p. 168/339).

Brown noted the seizures were sporadic and the date of the last seizure was October 2012. (Doc. 10, p. 169/339). Brown stated that it feels as if his head is stopped up, he loses vision, and then faints, both before and when having a seizure. Following a seizure, Brown says he is weakened and needs to lay down. (Id.).

On January 13, 2013, Benjamin Colvin, APRN, FNPC[2] ("Colvin") wrote a medical opinion on Brown's ability to perform work-related activities. (Doc. 10, p. 315/339). Colvin noted a maximum ability to lift and carry on an occasional basis of no more than ten pounds. Colvin indicated a maximum ability to stand and walk of about three hours during an eight hour day. Colvin indicated a maximum ability to sit for three hours during an eight hour day. (Id.). Colvin additionally noted that Brown could only sit, stand, or walk around for about twenty minutes at a time, and could only walk for ten minutes before changing position. (Doc. 10, p. 316/339). Colvin indicated that Brown had multi-joint osteoarthritis and joint pain, and could never twist, stoop, crouch, climb stairs, or climb ladders. (Id.). Brown's malaise and fatigue

---

[2] An advanced practice registered nurse (APRN) is a nurse with post-graduate education in nursing. FNPC is a Certified Family Nurse Practitioner.

would limit ability to push and pull certain objects. (Doc. 10, p. 317/339). Colvin indicated his assessment was based on physical exam and patient's history. (Doc. 10, p. 316-7/339). Colvin indicated that Brown would be absent from work on average more than four days per month. (Doc. 10, p. 318/339).

In March 2013, Dr. Charles Ugokwe ("Dr. Ugokwe") examined Brown for a Disability Determination Consultation Report. Dr. Ugokwe noted Brown gave a history of tremor, shoulder pain, inability to sleep, and could "hardly eat." Notes indicated that the tremor started several years ago and got worse since he stopped working and walking is described as "wobbling" till he starts going. A history of seizure, the first occurring in 2010, was also given. It was described as "something hit me and I go blank" and lasts for one to two minutes after which Brown goes to sleep. Brown stated the last seizure occurred in January 2013 but he could not give a seizure frequency.

Brown was submitted to strength testing. The physician noted that there was a fine tremor with an out-stretched hand with no cogwheeling. Finger to nose, finger to finger, and rapid alternating movements were normal. Heel-to-shin and rapid alternating movements were normal and there was mid truncal instability. The physician noted that there was possible mild cognitive impairment and gave a poor prognosis. (Doc. 10, p. 236-39/339).

In April 2013, Faye Thrasher ("Thrasher"), a licensed clinical psychologist, conducted an exam on Brown. (Doc. 10, p. 246/339). Brown stated that he could not eat or sleep and had lost approximately sixty pounds. Brown further stated that he

had headaches, lacked energy, and passed out, and was frustrated because he has had a lot of tests but doctors could not figure out what was wrong with him. Brown admitted to a history of alcohol abuse, but stated he no longer drank because he could not afford it. (Doc. 10, p. 247/339). Thrasher diagnosed Brown with Depressive Disorder, NOS (present and by history), cognitive disorder, NOS (present and by history) on Axis I. On Axis IV, Thrasher noted psychosocial stressors: cognitive impairment, numerous medical issues, interpersonal problems, and seizures, with a severity level of 3 (moderate). On Axis V, Thrasher noted GAF – 50.[3] (Doc. 10, p.

---

[3] The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client.  Axis I refers to clinical syndromes, Axis II to developmental disorders and personality disorders, Axis III to physical disorders and conditions, Axis IV to psychosocial stressors, and Axis V to the global (overall) assessment of functioning.  See Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-35 (4th ed. 2000) ("DSM-IV-TR").

The Global Assessment of Functioning, or GAF, score represents Axis V of the Multiaxial Assessment system.  The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client.  See Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-30 (4th ed. 2000) ("DSM-IV-TR").  GAF is a standard measurement of an individual's overall functioning level.  The GAF score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning with respect to psychological, social and occupational functioning, on a hypothetical continuum of mental health-illness.  The first number indicates the patient's current GAF, while the second number indicates the highest score reported in the previous year.  See DSM-IV-TR at 32-34.  The GAF scale goes from 0-100: **91-100** - superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities, no symptoms; **81-90** - absent or minimal symptoms, good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns; **71-80** - if symptoms are present, they are transient and expectable reactions to psycho-social stressors,  not more than slight impairment in social, occupational, or school functioning; **61-70** - some mild symptoms OR some difficulty in social, occupational or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships; **51-60** - moderate symptoms OR moderate difficulty in social, occupational, or school functioning; **41-50** - serious symptoms OR serious impairment with social, occupational, or school functioning; **31-40** - some impairment in reality testing or communication OR major impairment in several areas such as work or school, family relations, judgment, thinking, or mood; **21-30** - behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgement OR inability to function in almost all areas; **11-20** - some danger of hurting self or others OR occasionally fails to maintain minimal personal hygiene OR gross impairment in communication; **1-10** - persistent danger of severely hurting self or others OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death; and **0** - inadequate information.  See DSM-IV-TR, at 34; see also, Boyd v. Apfel, 239 F.3d 698 (5th Cir. 2001).

249/339). The prognosis was guarded. Thrasher noted Brown can moderately understand, minimally retain, and moderately follow directions. His remote memory appeared poor and his demonstrated recent memory appeared poor. Concentration and persistence were fair, judgment also appeared fair, and insight was poor. Thrasher noted that Brown did not appear capable of managing claimant's funds if awarded, since his sister manages his finances. (Id.).

On October 14, 2013, Brown was again seen by Colvin. Colvin noted that Brown was vague in his primary complaints, but had keloids, including the one on his neck, and a past history of coronary artery disease, hypertension, and alcoholism. Brown indicated that he did not have insurance, it had been several years since he had a checkup, and had not taken any medication in the last five to six months due to financial instability. Brown indicated that the keloid was occasionally painful, but that he did not have shortness of breath or distress. Further, Brown indicated he drank alcohol on a daily basis. Otherwise, he complained of knee and shoulder pain. During this visit, Colvin indicated he would see Brown weekly for no charge. (Doc. 10, p. 330/339).

On October 22, 2013, Brown presented for his one week follow-up. He had lab work performed at the prior visit, and it revealed normal liver enzymes, elevated total protein with low albumin, and elevated globulin. He stated that he used to drink on a daily basis, but was not able to financially afford it. (Doc. 10, p. 333/339). In the Impressions/Diagnosis section, Colvin indicated the keloid scar and weight loss, as well as "alcoholism?" and "malnutrition?". (Doc. 10, p. 334/339).

12

On January 8, 2014, Brown presented to Colvin for a check-up. He had no acute complaints, although his primary complaint was multi-joint pain. He had gained ten pounds over the last three months and his energy levels had improved, although his multi-joint pain limited his ability to be as active as he would like and to go from sitting to standing positions. His keloid scar was progressing, although he had not gone to LSUS for further evaluation and treatment as he did not have insurance. (Doc. 10, p. 336/339). Colvin's impression was that Brown likely had multi-joint osteoarthritis that is degenerative in nature, which effected his mobility to some degree, although Brown could ambulate independent of any assistive device. (Doc. 10, p. 337/339).

## Administrative Hearing

At his January 2014 administrative hearing, Brown testified that he was 57 years old, 6' tall, weighed 171 pounds, is right handed, and drives sometimes. (Doc. 10, pp. 38-39/339). Brown further stated he was single, with no dependents under the age of 18, and completed the twelfth grade in school. (Doc. 10, p. 39/339). The last time he worked at the lumber yard was in February 2012. (Doc. 10, p. 39/339). He stated the reason he stopped working was because he got sick and was passing out. (Doc. 10, pp. 40-41/339). He described it as he would "blank out," would fall, and lose consciousness for a little bit. (Doc. 10, p. 51/339). He stated that every time he went to the hospital they could not find anything wrong. (Doc. 10, p. 41/339).

Brown stated that he occasionally drinks beer. (Doc. 10, p. 41-42/339). He additionally testified that he is able to dress and bathe himself sometimes as well as

do laundry at times. (Doc. 10, pp. 44-45/339). He stated that he is not able to do yard work. (Doc. 10, p. 45/339).

Brown testified that he could only sit for around 30 minutes, before needing to stand up or stretch. (Doc. 10, p. 45/339). Brown stated that it is about the same for standing before needing to sit, unless he is holding on to or leaning against something. (Doc. 10, p. 45/339). He additionally stated he can only walk in terms of feet. (Doc. 10, p. 45/339).

Brown testified that he has a keloid on his neck that makes his head hurt, and that it occasionally swells and makes it difficult to turn his head or move his arm. (Doc. 10, p. 46/339). Brown stated that he gets headaches every month. (Doc. 10, p. 48/339). Brown testified that he has depression and has a problem being around other people, due to his keloid and feeling unable to relate to them. (Doc. 10, p. 48/339). Additionally, Brown stated that he has a problem every day with tremors throughout his body, but mainly in his hand and leg. (Doc. 10, pp. 48-49/339). He stated that due to the tremors in his hands, he drops thing and has difficulty holding items, such as a water glass. (Doc. 10, p. 44/339).

Brown further testified that he has had arthritis in both knees, his left hip, and right shoulder for the past three years but that it has gotten worse. (Doc. 10, p. 50/339).  Brown stated that the arthritis and the keloids prevent him from working. (Doc. 10, p. 51/339).

The VE testified that Brown's job on line supply at a lumber yard (the alternate title is material handler) was heavy work, SPV 3 (DOT 929.687-030). (Doc. 10, pp. 53-54/339).

The ALJ posed a hypothetical involving an individual with the same age, education, and work experience as Brown, with no exertional limitations, but unskilled, simple, routine, repetitive work, and involving occasional work-related decisions. (Doc. 10, p. 54/339). The VE responded that the individual would be able to work in SVP:2 and unskilled labor. The VE further responded that he could return to line supply work. (Doc. 10, p. 55/339).

The ALJ then allowed Brown's representative to ask further hypotheticals. The representative posed a hypothetical involving the same boundaries as the above hypothetical, but with an exertional limit that the individual would not be able to climb stairs, ramps, crawl, and stoop, and that the individual would miss work at least three days a week. (Doc. 10, p. 55/339). The VE testified that the individual would not be able to perform prior relevant work. (Doc. 10, pp. 55-56/339). The VE further testified that there are no jobs such an individual can do as that is excessive absenteeism. (Doc. 10, p. 56/339). By removing the excessive absenteeism from the hypothetical, the individual still would not be able to do the line supply work. (Doc. 10, p. 56/339).

## ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. § 404.1520(a). The sequential process required the ALJ to determine whether

Brown (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work he did in the past; and (5) can perform any other type of work. If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. See Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987)).

To be entitled to benefits, an applicant bears the initial burden of showing that he is disabled. Under the regulations, this means the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. See Greenspan, 38 F.3d at 237.

In this case, the ALJ found that Brown has not engaged in substantial gainful activity since February 1, 2012, that he meets the insured status requirements of the Social Security Act through December 31, 2017, and that he has severe impairments of affective disorder (depression) and a cognitive disorder, but that he does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1. (Doc. 10, pp. 18-22/339). The ALJ also found that Brown is able to perform a full range of work at all exertional levels but is limited to simple, routine, repetitive work and only has the ability to occasionally make work-related decisions.

16

(Doc. 10, p. 25/339). The ALJ found that Brown is capable of performing his past relevant work on line supply. (Doc. 10, p. 26/339).

The ALJ found that the claimant's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible, and gave considerable weight to the opinion of the state agency medical consultant. (Doc. 10, pp. 25-26/339). The ALJ gave no weight to the opinion of Benjamin Colvin since it was from an unacceptable source and was not supported by the objective medical evidence in the record. (Doc. 10, p. 26/339).

## II.   <u>Law and Analysis</u>

Brown contends that the ALJ erred in finding that Brown's physical impairments were "not severe" as it was contrary to the assessment of Brown's treating source, which the ALJ improperly rejected.

The regulations state that an "impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508. Furthermore, "a physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms." <u>Id.</u> While symptoms are the person's own description of their impairment, these statements alone are not enough to establish an impairment. 28 C.F.R. § 404.1528(a).   Signs are defined as "anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic

17

techniques." 28 C.F.R. § 404.1528(b). Laboratory findings are defined as "anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques." 28 C.F.R. § 404.1528(c).

"Regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e. medical signs and laboratory findings." SSR 96-4p. The testimony alone is insufficient to establish that an impairment exists. See S.M.P. v. Colvin, Civ. No. 13-cv-0966, 2014 WL 6460191 (W.D. LA. Nov. 17, 2014).

The "Medical Opinion Re: Ability to Do Work-Related Activities (Physical)" provided by Benjamin Colvin is not substantial evidence to establish the severity of Brown's conditions that would limit him from performing even sedentary-level work. Benjamin Colvin is an Advanced Practice Registered Nurse. Therefore, he is an "other medical source," rather than an "acceptable medical source." 20 C.F.R. § 404.1513(a); 20 C.F.R. § 404.1513(d)(1). Only acceptable medical sources can provide evidence to establish a claimant's impairment and how it affects his functional ability. 20 C.F.R. § 404.1513(a); see also Harvey v. Astrue, No. 12-2267, 2013 WL 2244282, *8 (E.D. LA. May 21, 2013).

In addition to evidence from an acceptable medical source, the ALJ may also use evidence from other sources to show the severity of the impairment. 20 C.F.R. § 404.1513(d)(1). Although Brown refers to Colvin as a treating source throughout his brief, a treating source is a claimant's "own physician, psychologist, or other

**acceptable medical source.**" 20 C.F.R. 404.1502 (emphasis added). As noted above, Colvin is not an acceptable medical source. Furthermore, based on the medical records, when Colvin completed his assessment of Brown, it was the first time he had ever seen and assessed Brown. The ALJ determined that Colvin's assessment was not from an acceptable medical source and that Colvin's assessment was not supported by the objective medical evidence in the record. Brown has not shown that the ALJ did not follow proper legal standards.

Brown therefore has no acceptable medical evidence that establishes the existence of seizures or osteoarthritis. Although Brown described his symptoms as "something hit me and I go blank" and stated he had a history of seizures in his disability application and, on occasion, to his doctors, there is a lack of objective medical evidence that establishes the existence of a seizure impairment. No physician ever diagnosed Brown with a seizure impairment. Furthermore, Brown had an electroencephalogram (EEG) performed by Dr. Ugokwe which came back normal. As the medical test undermined the testimony, and there was no other acceptable medical evidence establishing a seizure impairment, Brown's condition cannot be considered severe.

Similarly, there is not acceptable medical evidence establishing osteoarthritis or any medically determinable impairment that caused Brown's alleged joint pain. As noted above, Colvin's opinion is not an acceptable medical source. Only acceptable medical sources can provide evidence to establish a claimant's impairment. Thus, Brown's condition cannot be considered severe.

The ALJ also had substantial evidence to conclude that Brown's headaches resulted in no significant functional loss and were therefore non-severe. Brown had testified that he only gets headaches about once a month and there is no medical evidence associating functional deficits with Brown's headaches.

Unlike the alleged seizures and osteoarthritis, Brown's tremors have been observed and assessed by physicians. Brown was assessed by Dr. Ugokwe and submitted to strength testing. The physician noted that there was a fine tremor on out stretched hand with no cogwheeling. Finger to nose, finger to finger, and rapid alternating movements were normal. Heel-to-shin and rapid alternating movements were normal and there was mild truncal instability. Additionally, when Brown presented to the Central Louisiana Emergency Department, the physician noted that Brown had slight tremors. Despite Brown's complaints, the medical records indicate that the ALJ had substantial evidence to conclude that Brown's tremors resulted in no significant functional loss and was non-severe.

The ALJ did note that Brown's keloids may prevent full range of motion of the neck, but concluded that the limitation would not interfere with the performance of substantial gainful activity. For instance, while Colvin indicated that the keloid "seems to limit his ROM [range of motion] with his neck" (Doc. 10, p. 337/339), at other examinations his neck exhibited a normal range of motion. (Doc. 10, pp. 237-38, 294-95/339). Based on the medical record, Brown only complained of dysphagia once, along with fatigue, when he received an examination from Dr. Dupree in July 2012. (Doc. 10, p. 270/339). Brown additionally indicated fatigue again during an

appointment with Colvin. (Doc. 10, p. 317/339). Again, the medical records indicate that the ALJ had substantial evidence to conclude that Brown's keloids resulted in no significant functional loss and were non-severe.

Brown further contends that the ALJ had a duty to develop a full and fair record. 20 C.F.R. § 404.1520b outlines the options available if the ALJ is not able to make findings due to insufficient or inconsistent evidence. Specifically, evidence is insufficient if "it does not contain all the information we need to make our determination or decision." 20 C.F.R. § 404.1520b.  Evidence is inconsistent "when it conflicts with other evidence, contains an internal conflict, is ambiguous, or when the medical evidence does not appear to be based on medically acceptable clinical or laboratory diagnostic technique." Id. However, it is the Claimant's responsibility to prove to the Commissioner that he is disabled. 20 C.F.R. § 404.1512(a). The Claimant must submit all the evidence known to him that relates to whether he is disabled. 20 C.F.R. § 404.1512(c).

An ALJ has a duty "to develop the facts fully and fairly relating to an applicant's claim for disability benefits." Ripley v. Chater, 67 F.3d 552, 557 (5th Cir. 1995). "If the ALJ does not satisfy his duty, his decision is not substantially justified." Id. However, reversal is only appropriate if the applicants shows that he was prejudiced by the decision. Id. If there is substantial evidence in the existing record to support the ALJ's decision, that ends the inquiry. Id.

Here, the ALJ did not err as there was substantial evidence to make the decision. The ALJ was not delinquent in any duty to refer Brown for a consultative

21

examination or the other options available under Section 404.1520b. The regulation provides that the ALJ "may" ask to recontact a treating physician, for additional existing records, for claimant to undergo a consultative examination, or for further information from claimant or others **if** the evidence is insufficient or if the Commissioner is otherwise unable to reach a conclusion about whether the claimant is disabled. 20 C.F.R. § 404.1520b(c) (emphasis added). In this case, there is a lack of proof for Brown's claims as opposed to an insufficiency that would compel the Commissioner to obtain additional evidence. And the regulations do not allow the claimant to shift the burden of proof to the Commissioner.

It is clear that the ALJ considered the entire record, including the medical records from Brown's visits with Dr. Dupree, his neurological exam, the consultative examination performed on March 18, 2013, and his visit to the Central Louisiana Emergency Department, along with Brown's testimony. Additionally, the ALJ considered the opinion of Benjamin Colvin, but as it was from an unacceptable source and not supported by the objective medical evidence, no weight was given to the opinion. The ALJ properly evaluated Brown's claim.

Since substantial evidence supports the ALJ's decision to find Brown is not disabled, Brown's appeal should be denied and dismissed with prejudice.

III.   <u>Conclusion</u>

Based on the foregoing, IT IS RECOMMENDED that Brown's appeal be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.   No other briefs (such as supplemental objections, reply briefs, etc.) may be filed.   Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS  DONE  AND  SIGNED  in  chambers  in  Alexandria,  Louisiana,  this _23rd_ day of October, 2016.

Joseph H.L. Perez-Montes
United States Magistrate Judge

23